<pre>
              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MARYLAND


CBAY SYSTEMS, LTD.                 :
                                   :
v.                                 :  Civil No. WMN-05-999
                                   :
EMERGENCY DICTATION SERVICES,      :
     INC. et al.                   :
</pre>

**MEMORANDUM**

Before the Court is Defendant's Motion To Dismiss and/or To Transfer Venue.  Paper No. 13.  The motion is fully briefed. Upon a review of the pleadings and the applicable case law, the Court determines that no hearing is necessary (Local Rule 105.6) and that the motion shall be granted.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

This case arises out of the sale of a business that provides medical transcription services.   In February 2004, Plaintiff CBay Systems, Ltd. (CBay) purchased substantially all of the assets of Defendant Emergency Dictation Services, Inc. and Defendant Dictation International, LLC (collectively referred to herein as EDS) pursuant to an Asset Purchase Agreement (APA). Defendants Keri Topouzian, David Muzzin, and Krishna Gondi were the sole shareholders of EDS and were parties to the APA.

In connection with the sale of the business, Topouzian and Muzzin agreed to become employees of CBay pursuant to written employment agreements.  Defendant Gondi agreed to become an

employee of CBay's Indian subsidiary.[1]  While Topouzian initially signed an employment agreement similar to that signed by Gondi and Muzzin, six months after the sale, Topouzian's role changed from that of an employee to that of an independent contractor. With that change in role, Topouzian entered into a Sales and Marketing Distribution Agreement (the distribution agreement) with CBay.

The employment agreements and the distribution agreement all contained similar trade secret and non-competition restrictions. The employment agreements contained the following provision:

> **14. Non-Circumvention, Trade Secrets, Confidential Information, and Restrictive Covenant:** Employee agrees to execute and to abide by the terms and conditions of Exhibit 1 hereto, which is incorporated herein and made a part hereof for all purposes. Employee further acknowledges that the business model and relationships of CBay Systems, Ltd. are unique, and those relationships and business model have been developed at great expense over a period of years.  Employee further agrees to keep all aspects of the business of the Company confidential, except as necessary to execute [his duties].  Employee further agrees not to circumvent the Company in any business dealings, not using contacts made through this employment relationship to further outside business interests and not using contacts made through this employment relationship to the detriment of the Company.

---

[1] Under CBay's business model, health care professionals dictate medical reports over a standard phone line.  That report is then digitized and that voice file is transmitted to a transcriptionist for typing.  The transcriptionist sends the report back to CBay as a text file, and CBay routes that file back to the health care professional.  Apparently, many of CBay's transcriptionists are located in India and Gondi is connected with that aspect of the business.

Defs.' Exs. B, C, D.  Exhibit 1, which was attached to each of
the employment agreements, reiterates the substance of some
portions of the above-quoted language from paragraph 14.  It also
provides some further elaboration.  For example, Exhibit 1
provides the length of time that the confidentiality provisions
and restrictive covenants were to be in force.  As discussed
below, Exhibit 1 also includes a "liquidated damages" clause.

  While these confidentiality provisions and covenants not to
compete would later become the focus of much attention, this
dispute initially centered on a disagreement over CBay's
performance of its obligations.  Under the terms of the APA, CBay
was to pay the purchase price in three installments: half of the
purchase price at closing; one quarter on the first anniversary
of the closing (the 2005 Installment); and one quarter on the
second anniversary of the closing (the 2006 Installment).  The
APA allowed, however, that should the business not perform as
well as projected, the amounts of the 2005 and 2006 Installments
would be decreased according to a set formula.  CBay made the
initial payment of approximately $1.2 million.  When it came time
to make the 2005 Installment, however, a dispute arose concerning
the calculation of the amount of that payment.  Defendants
initially calculated that the amount due under the APA was in
excess of $500,000.  CBay asserted that the amount was zero.

  After unsuccessful attempts to resolve this disagreement
through negotiations, counsel for Defendants sent a letter to

CBay on April 7, 2005,[2] demanding payment and indicating that if payment was not received, they would pursue litigation.  On April 11, 2005, the second business day after CBay received this letter threatening litigation, CBay filed this suit in this Court.  The original complaint contained a single count.  In that count, CBay sought a declaratory judgment that it owed nothing to Defendants under the APA or for any other reason.

On May 31, 2005, Defendants filed their own suit against CBay in the Eastern District of Michigan for breach of contract. Emergency Dictation Services, Inc. v. CBay Systems, Ltd., Case No. 05-CV-072137 (E.D. Mi.) (the Michigan suit).  While Defendants were aware of this suit at the time they filed the Michigan action, CBay had yet to serve the complaint in this action on Defendants.  CBay did not do so until June 13, 2005.

On June 15, 2005, just two days after serving Defendants, CBay filed a motion for a temporary restraining order (TRO). CBay complained in this motion that the software that allowed it to transmit the voice recordings, to receive the transcribed reports, and to bill its customers for those reports was no longer operating properly.  CBay asserted that Defendants Topouzian, Muzzin, and Gondi were sabotaging the software.  CBay also alleged that these three had formed a new company, Central Transcription Services (CTS), that was directly competing against CBay.  Furthermore, CBay claimed that Defendants were using the

_____

[2] The letter is dated April 6, 2005.  CBay claims that it was not sent until April 7, 2005.

EDS tradename to confuse CBay's customers, were luring CBay's employees to leave CBay and to come to work for CTS, and were using their knowledge of CBay's pricing structure and customers to outbid CBay in the market.

The Court held a hearing on the TRO motion the very next day.  The Court found the motion to be without merit and denied it with an oral ruling issued from the bench.  The Court also noted at the end of the hearing that is was highly unusual to consider a motion for a TRO in an action where there is not also a petition for a preliminary injunction.  The Court informed counsel that should a motion for preliminary injunction be filed, the Court would consider hearing it on an expedited schedule. Tr. of June 16, 2005 Hearing 58-59.  CBay has yet to file a motion for a preliminary injunction.

Shortly after the June 16, 2005 hearing, CBay did file an amended complaint based upon the allegations set forth in the TRO motion.  The Amended Complaint included nine additional counts:

> Count II - Federal Unfair Competition;
>
> Count III - Common Law Unfair Competition;
>
> Count IV - Federal Trademark Infringement;
>
> Count V - Tortious Interference with Contracts;
>
> Count VI - Misappropriation of Trade Secrets and Proprietary Information;
>
> Count VII - Conversion;
>
> Count VIII - Fraud;
>
> Count IX - Breach of Asset Purchase

Agreement; and

Count X - Enforcement of Non-Competition
Agreements.

In the instant motion to dismiss and/or transfer, Defendants argue that these nine new counts can be dismissed as they are all subject to mandatory arbitration pursuant to broad arbitration provisions contained in both the employment agreements and the distribution agreement.  The Employment Agreements each contain the following provision:

> **Arbitration:** <u>Any controversy or claim arising out of or relating to this Employment Agreement</u> shall be submitted to binding arbitration in Annapolis, Maryland, in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association.  Any such arbitration shall take place before a single arbitrator selected pursuant to the AAA Rules.  Judgment upon the award rendered by the arbitrator(s) may be entered in any court of competent jurisdiction.

Exs. B, C ¶¶ 12 (emphasis added).[3]  The Topouzian distribution agreement contains a similar provision:

> <u>Any controversy or claim arising out of or relating to this Agreement</u>, or breach thereof, shall be settled by arbitration in accordance with the Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

Ex. E at 6 (emphasis added).

With the dismissal of Counts II through X, Defendants argue

---

[3] Gondi's employment contract contained an identical provision except that the mandated arbitration was to take place in the Republic of India, instead of Annapolis.  Ex. D ¶ 12.

that what remains of the case, <u>i.e.</u>, the declaratory judgment claim, should be transferred to the Eastern District of Michigan for consolidation with Defendants' breach of contract claim.

While this motion was pending here, a similar motion to transfer was filed by CBay in the Michigan action.  District Judge Nancy Edmunds held a hearing on CBay's motion to transfer on October 19, 2005.  She indicated from the bench that the motion would be denied, with a written ruling to follow.  The next day, on October 20, 2005, CBay filed an "Emergency Motion for a Temporary Restraining Order" in this Court.  In this motion, CBay complains that one of its largest customers, a Michigan hospital, was about to switch over from CBay to CTS. This Court held a hearing on that motion on October 25, 2005, and denied it.  On the same day, Judge Edmunds issued her written opinion denying CBay's motion to dismiss or transfer.[4]

## II. DISCUSSION

### A. Agreement to Arbitrate

In determining whether to give effect to an arbitration agreement, the Court must bear in mind the "liberal federal policy favoring arbitration agreements."  <u>Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. 1, 24 (1983).  The

---

[4] Judge Edmunds' decision contained a more detailed account of the negotiations between the parties leading up to these lawsuits.  This Court adopts and incorporates that factual background as part of this decision.

Federal Arbitration Act (FAA)[5] "establishes that, as a matter of
federal law, any doubts concerning the scope of arbitrable issues
should be resolved in favor of arbitration, whether the problem
at hand is the construction of the contract language itself or an
allegation of waiver, delay, or a like defense to arbitrability."
Id. at 24-25.  This strong federal policy favoring arbitration
was intended to put arbitration agreements "on the same footing"
as other contractual agreements.  Allied-Bruce Terminix Cos.,
Inc. v. Dobson, 513 U.S. 265, 275 (1995).  Under these
principles, courts should grant requests to arbitrate a dispute
"unless it may be said with positive assurance that the
arbitration clause is not susceptible of an interpretation that
covers the asserted dispute." United Steelworkers of Am. v.
Warrior & Gulf Navigation, 363 U.S. 574, 582-83 (1960).
Furthermore, both the Supreme Court and the Fourth Circuit have
construed language such as that used here - "any controversy or
claim arising out of or relating" to an agreement - to be broad
arbitration clauses capable of an expansive reach. See Prima
Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 398 (1967)
(labeling as "broad" a clause that required arbitration of "[a]ny

---

[5] The FAA applies where there is a "written provision in   .
. . a contract evidencing a transaction involving [interstate]
commerce to settle by arbitration a controversy thereafter
arising out of such contract . . . ."  9 U.S.C. § 2.  Here, the
parties do not dispute that the agreements at issue involve
interstate commerce.

controversy or claim arising out of or relating to this Agreement"); <u>American Recovery Corp. v. Computerized Thermal Imaging, Inc.</u>, 96 F.3d 88, 93 (4th Cir. 1996) (same).

CBay's primary argument against arbitration, at least as to Counts II through IX, is that these claims arise out of the APA and not out of the employment agreements or distribution agreement.  While the APA does have some arbitration provisions tied to the performance of specific provisions not relevant here, it is undisputed that the APA does not contain an overall arbitration clause.  CBay's argument, however, that its claims do not arise out of the employment and distribution agreements is specious at best, and furthermore, is belied by CBay's own recent pleadings and argument.

Although cast under various legal theories, the gravamen of each of Counts I through IX is that Defendants are competing with CBay in offering medical transcription services.  In Counts II, III, and IV, CBay alleges Defendants are unfairly competing by using and infringing upon CBay's trademark and tradename.  In Count V, CBay alleges that Defendants interfered with CBay's contractual relationships with its customers with "the expectation, ultimately realized, of providing medical transcription services to some or all of CBay's customers."  Am. Compl. ¶ 67.  While Counts VI and VII focus on allegations of misappropriation and conversion of CBay's software and other trade secrets, the alleged object of that misappropriation and conversion clearly was to enable Defendants to solicit CBay's

customers and compete for their business.

In Count VIII, one of the representations that CBay contends was fraudulent was the representation that Defendants intended "to no longer be in the medical transcription business except as through CBay." Id. ¶ 84.  Again, this clearly implicates Defendants' agreements not to compete against CBay, agreements that were only contained in the employment agreements.  Finally, while captioning Count IX as a claim for breach of the APA, among the actions specifically identified by CBay as conduct constituting a breach is that "Defendants also have failed to fulfill their other obligations under, or as conditions to the APA, including without limitation by failing to live up to the terms of their agreements not to compete with CBay." Id. ¶ 89 (emphasis added).  Thus, while Counts II through IX may also be related to the broader APA agreement, it cannot be reasonably concluded that these claims are not also related to the employment and distribution agreements.

CBay has a still more difficult task distancing Count X from the arbitration provisions in the employment and distribution agreements.  CBay captioned this count as a claim for "Enforcement of Non-Competition Agreements" and specifically references the employment and distribution agreements in this portion of the Amended Complaint.  See id. ¶¶ 93-97.  While acknowledging that this count "bears a significant relationship to the employment agreements," Opp. 14, CBay contends that it should not be subjected to arbitration because this claim will be

"resolved completely" by the Court's determination as to whether CBay or Defendants are correct in their calculation of the amount due as the 2005 Installment payment.  This argument is premised on provisions in the employment agreements that allow Defendants to treat the non-competition agreements as "null and void" should CBay breach its payment obligations under the APA.  Exs. B, C, D at 6.  In CBay's view, rather than direct the parties to arbitrate the claim asserted in Count X, "the Court (and the parties) should simply set it aside until the Court decides under Count I whether a 2005 Installment payment was due."  Opp. 15.

The Court is not as convinced as CBay that the resolution of Count I will also "completely resolve" Count X.  Should CBay not be found in breach of its obligation, there remains the question as to whether Defendants breached the restrictive covenants in the employment and distribution agreements.  There is also at least some question as to whether the covenants are enforceable and, if so, as to which Defendants.  While CBay may be convinced that it knows the answers to these questions, at this stage in the proceedings the Court cannot conclude that there would be nothing left to arbitrate.

The centrality of the non-compete provisions in the employment and distribution agreement to CBay's claims was highlighted by the pleadings filed and arguments made in connection with the most recent motion for a TRO.  As the first ground for its motion, CBay asserts "Topouzian entered a 'Sales and Marketing Distribution Agreement' with CBay that contains a

restrictive covenant, under which Topouzian agreed not to solicit CBay's clients, or CBay's employees . . . ."  Emergency Mot. at 1.  While the APA was certainly mentioned and its terms discussed, a substantial portion of CBay's argument at the hearing related to whether Topouzian was violating his promise in the distribution agreement not to "solicit, contact or communicate with any then-existing" client of CBay.  As these recent proceedings definitely demonstrated, CBay's claims clearly relate to restrictive covenants in the employment and distribution agreements.

As an alternative to its argument that these Counts either arise under the APA or will be resolved by the resolution of its declaratory judgment count, CBay argues that, despite the above quoted language, the parties intended a narrow interpretation of the arbitration clause.  This narrow interpretation, in CBay's understanding, does not encompass claims for violation of the non-compete agreements.  CBay premises this argument on a liquidated damages provision included in Exhibit 1 attached to the employment agreements and a similar provision in the distribution agreement.  The provision in Exhibit 1 states:

> A material violation by Employee of the
> provisions herein shall make him liable for
> liquidated damages in the amount of $200,000.
> The parties agree that this is a reasonable
> sum in view of the difficulty in proving
> actual monetary or other damages in the event
> of such a breach.  The Company may elect, in
> lieu of seeking liquidated damages, to obtain
> an injunction by a court with jurisdiction to
> prevent or stop any such violations by the
> Employee and to claim its actual damages

caused by any breach hereof by Employee.

Ex. B at 6.[6]

The Court must agree that this provision creates some ambiguity as to the arbitrability of claims arising out of an alleged breach of the non-compete agreements.  On the one hand, the employment agreements contain sweeping arbitration language and state that Exhibit 1 is incorporated into those agreements and made part thereof "for all purposes."  Furthermore, the employment agreements contain provisions, in addition to those set out in Exhibit 1, that the employee "further agrees to keep all aspects of the business of [CBay] confidential, . . . agrees not to circumvent [CBay] in any business dealings, not using contacts made through this employment relationship to further outside business interests and . . . to the detriment of [CBay]." Arguably, CBay's instant claims arise as much under these provisions set out in the main body of the employment agreements as they arise under the more specific provisions in Exhibit 1. On the other hand, the liquidated damage provisions in Exhibit 1 seem to open the door to a "court with jurisdiction."[7]

_____

[6] This provision in each Exhibit 1 is identical except for the particular liquidated damage amount inserted for each employee.

[7] The employment agreements are hardly models of good drafting practices.  From the captioning and numbering of its provisions, Exhibit 1 appears to have been pasted together from a number of other documents.  Following un-numbered sections captioned "*TRADE SECRETS AND CONFIDENTIAL INFORMATION*," "*COVENANT NOT TO COMPETE*," and "*RESTRICTIVE COVENANT*," the drafter then includes three paragraphs numbered "8," "9," and "10."  Paragraph "8" is the liquidated damages clause.

13

The distribution agreement is even more ambiguous.  The
drafter of this agreement appears to have taken provisions from
Exhibit 1 and pasted them into the body of the distribution
agreement.  What results is an agreement that states in Section 9
that "[a]ny controversy or claim arising out of or relating to
this Agreement, or breach thereof, shall be settled by
aribitration," but in Section 16 states that "a material breach
by Distributor of the provisions herein" will entitle CBay to
liquidated damages and permit it to bring the matter into "a
court with jurisdiction."

The case law is clear that courts should grant requests to
arbitrate a dispute "unless it may be said with positive
assurance that the arbitration clause is not susceptible of an
interpretation that covers the asserted dispute." Warrior & Gulf
Navigation, 363 U.S. at 582-83.  Here, the Court cannot conclude
with that positive assurance that claims such as those raised in
Counts II through X were not intended to be arbitrated.  While
the Court can guess at the intent of the parties as to what must
be arbitrated under the agreements, where the Court must guess,
the contracts are ambiguous.  Accordingly, the Court will dismiss
Counts II through X.

B. Transfer of Count I

What remains in this action is CBay's declaratory judgment
claim.  This action is now the mirror image of the Michigan

litigation and as CBay appropriately observed in its pleadings in the Michigan action, "[p]roceeding with both cases would be an entirely duplicative waste of judicial resources." <u>Emergency Dictation Services</u>, Oct. 25, 2005 Op. at 1 (quoting CBay's Mot. at 6).  After considering the identical arguments raised here, Judge Edmunds determined that CBay's choice of forum was not entitled to any weight under the first-to-file rule, <u>id.</u> at 6, and that the balancing of the relevant factors, "weigh heavily in favor of a Michigan venue." <u>Id.</u> at 7.  That conclusion is only bolstered by the Michigan-centric nature of the arguments heard this week in this Court.  For the reasons given by Judge Edmunds in denying CBay's motion to transfer, this Court will grant Defendants' motion.

**III. CONCLUSION**

    For the reasons set forth above, this Court will dismiss Counts II through X of the Amended Complaint.  The remainder of this action will be transferred to the Eastern District of Michigan for consolidation with the parallel action there.  A separate order consistent with this memorandum will issue.


                                     /s/
                                William M. Nickerson
                                Senior United States District Judge

Dated: October 27, 2005